U.S. v. Fernandez Good afternoon, your honors. My name is Michael Bachrach. I represent the defendant, Jonathan Hernandez, who in this case seeks remand for resentencing, principally because the government breached his plea agreement at the time of his sentencing. This court has long held that allegations of breach of plea agreements depend on what the reasonable understandings and expectations are of the defendant at the time of his sentencing, I mean, at the time of his plea. Additionally, this court has explained that the threshold question is whether the government's actions qualified as advocating for this changed exposure. Here, clearly, both occurred. With respect to the threshold question, your honors, the government did two actions which would qualify for requesting a changed exposure. In the plea agreement, the government, which the government drafted, the government's stipulated guideline range was 324 to 405 months' imprisonment. However, at the time of the government's submission of its sentencing memorandum, the government sought a higher guideline range. Rather, they sought the inclusion of a two-point sentencing enhancement that had not been included and that raised the guidelines to life. And I understand that claim. And in reading your brief, there was some claim that not withstanding the language of the plea agreement, the government had sort of agreed it wouldn't seek a higher sentence. But help me understand how you get around the language of the plea agreement in which the government says, hey, we're not bound by this calculation. We can argue for a different calculation. So there were no promises in the plea agreement itself. And both counsel, well, the client was canvassed about it, asked if you read the plea agreement. So that's, I think, the problem here, is the plea agreement is very express, that there were no promises. It goes to, Your Honor, I think that's a fair question and a fair point. It, however, goes to the question of what was the defendant's reasonable expectations be based upon the plea agreement. This is a multi-defendant case with dozens, probably dozens of defendants. I forget the total. I think it was 30 or 40 possibly even. Every defendant that was sentenced had that similar language, yet the government held to the sentencing guideline analysis. In the case of the defendant that was most similarly situated, that would be Nelson, Argenta, Quintanilla. Let me ask you about the guidelines themselves. They're advisory, right? Yes, Your Honor. And did the judge, the sentencing judge, take account of the fact that they're advisory? Yes, Your Honor, but the starting point changed, and that starting point is significant. The starting point of life is a completely different ballpark. When the judge sentenced the defendant to 520 months, in his view, he was doing a downward variance from the potential life sentence as opposed to an upward variance of 115 months. Well, the difference in the guideline calculation was prompted by the fact that the government's initial calculation hadn't taken in the two-point enhancement for the restraint of victims. Now, that was identified by the probation department in its report, correct? Correct, Your Honor. So the government says, that's right, but even if the government had stood mute, which is what I think you're saying it was obliged to do by its plea agreement, are you suggesting that the probation department was wrong, or that the court would not itself have realized that these victims having been bound, that that enhancement applied? I mean, it almost seems to me that so what, that the government acknowledged what it had failed to recognize at the start? Well, I think, Your Honor, first of all, factually, as I stated in the district court— Do you agree that the probation department is who identified this? This is what I was about to say, Your Honor, yes. Do you have, or did you have an argument that they weren't bound, and therefore the enhancement should not have applied? Your Honor, I cannot dispute that the probation department can make that finding, and that if the judge wished to follow the probation department's finding, he could. There's no question. I mean, the judge could depart, as Judge Cabrera said, these are advisory, but in calculating the guidelines, the judge would have been obliged to find that enhancement applicable given the facts, right? The judge has the discretion as to whether or not to impose it or not. Again, United States— He had the discretion whether to impose a guideline, but your complaint here is that he had to calculate the guidelines correctly. Now, because that's the starting point. Wouldn't this have been the starting point, whether the government had opened its mouth or not? No. Why? Help me out. Sure. For the co-defendant, that's the perfect example, which is defendant Nelson Argenta Quintanilla. The same facts occur, same situation. The plea agreement did not include the two-point enhancement. Probation department identified it, said that we think it should be applied. What did the government do? The government responded, yes, that's there, but we believe, Your Honor, we believe the court should hold to the terms of the agreement. That's what they held. They held to the terms of the agreement, and that is then what the judge did. They asked for a sentence at the high end of Mr. Nelson Quintanilla's guideline range, his original guideline range under the plea agreement, and the judge then imposed a sentence that was within that guideline range. In this case— But that may be an argument of how the government chooses to treat defendants, whether they're consistent, and that would be wrong, right? Not to treat people consistently, but if the plea agreement, the terms of the plea agreement expressly say the government will not be bound by this calculation, how is it a violation of that agreement if the agreement doesn't bind them? Again, as I was trying to state earlier, Your Honor, it's based upon what is the defendant's reasonable understanding and expectations. Well, isn't his reasonable expectation based on what the plea agreement that he entered into and signed? Coupled with how that plea agreement is being relied upon by the government in the case. Well, it's a written contract, and your client signed a contract that said if the guideline offense level advocated by the office is for any reason, including an error in estimate different from the estimate, the original one, the defendant will not be entitled to withdraw the plea, and the government will not be deemed to have breached this agreement. How is your client not bound by that language? Your Honor, any ambiguity in the plea agreement is strictly constricted. Well, what's ambiguous about it? Your Honor, again, it goes to the defendant's understanding of the language. When he is, and his expectations. Did your client sign an affidavit in this case? I mean, this wasn't even raised in the district court, so you're arguing your client's expectation. We have nothing in the record to tell us what your client's expectation was. My client's expectation, what's in the record is me arguing at the time of sentencing how the plea negotiations took place, which includes, and the government did not contest this, Your Honor, includes a specific discussion where when deciding what counts to plead guilty to and what the guideline analysis would be, the government was specifically attempting to choose counts that would result in a plea with a guideline range less than 360 to life. That was raised in the district court record. Well, when you negotiate an agreement that says if the estimate is, quote unquote, for any reason, close quote, different from what the estimate, the defendant will not be entitled to withdraw and the government will not be deemed to have breached this agreement, what do you think it meant? What do you think for any reason meant? It seems to be intended to be comprehensive. It does. And there's an expectation that when the government is negotiating a plea agreement and they're saying we're picking this specifically because we're trying to find numbers that will get you below 360 to life, there's an expectation that the government will not seize upon at a later moment an opportunity to change that. Otherwise, the government was fully aware at the time of the plea negotiations that he would have never entered into this plea agreement. What is in the agreement that signals that? What you're arguing seems to be contrary to the language that everybody signed. So what's in the agreement that supports the interpretation you just urged on us? In the agreement? Yes, in the agreement. In the agreement. Because you're saying they breached the agreement. In the specific language of the agreement, nothing. In, however, when we were then explaining this issue to the district court and this the government stood moot. Not at the time of the guilty plea. In attempting to explain the understanding of the defendant.  Not at the time of the guilty plea did anybody say, well, the language says this, but it's actually squishier than that. Correct, because every other defendant who had been sentenced in this case, the government stood by the plea agreements. There was no reason to believe that they wouldn't. What plea agreement? Well, for starters, Nelson, every defendant's plea agreement has the same language that you're keying in on, Your Honor. And again, Nelson, Quintero, Argentina. That's the perfect example. That seems to me to argue that the government didn't insist on its rights under the plea agreement for others. And so you're arguing that they shouldn't be allowed to insist on the language of the plea agreement with your client. Not that they breached the agreement. Am I missing something here? I think we're saying it in different ways. I can't disagree that the exact language is what the exact language is. But again, the question goes to what's the defendant's reasonable understanding. And with that, that is where I think, Your Honor, and I disagree. I've also read this record, and it doesn't seem to me that your client's sentence was informed by the fact that he bound these people as much as by the brutal murders of them and others with baseball bats, with pipes, and that he committed these crimes even after he had committed other heinous crimes. That seems to be what drove this sentence, not the fact that on one occasion he bound people. Your Honor, that goes to the substantive reasonableness argument. And all the other co-defendants who were also charged in the Acosta murder, which is the murder where the person was bound, and some of the co-defendants who were charged with the Johnson murder, they received lesser sentences. The Johnny Contreras, for example, got 360. Mr. Nelson Argento Quintanilla, who I keep referring to, only got 327 months. Now, there were two defendants who were charged on a separate indictment who did get more than Mr. Hernandez. They got 600 and 660 months. I acknowledge that. Separate indictment. They were both minors, so I don't have the full record. But what I do know is that in both of those cases, the defendants were convicted of four murders. So four murders versus two is a difference. Yes, it's awful. There's no question it's awful. There's no question that a significant and severe sentence is appropriate in this case, Your Honor. But just how significant, just how severe, has to be consistent with the other defendants in this case and the other defendants in MS-13 cases in this district. And this sentence was well beyond any of those others. Prior to this one, the highest that I'm aware of is 480 months, for a two-defendant case, which, by the way, Your Honor, is the amount the government saw in this case. So the government recognized that 480 months was an appropriate sentence, and the government recognized this based upon the prior history. Right, but this was the judge's call. This was the judge's call. And the judge was being substantively unreasonable by departing so vastly from how similarly situated defendants in this district had been treated, both in this case and in other MS-13 cases. So is your argument that the sentence is disparate, that it violates the disparity clause? On point 2, that is part of the argument, yes. That's on page 45, 46. I understood the argument was substantively unreasonable. Given the brutality of these homicides, I don't know how we could find that. Your Honor, it's a balance. There's no question there's a brutality. That's why he deserves at least 30 years or at least 25 years in jail or even 30 years in jail. What you're saying is that 580 or 520 was outside the permissible range, and I'm not sure we could say that given the brutality of the crimes. It is certainly disparate from any prior sentence of an MS-13 defendant in this district. The highest prior to that for two murders had been 480 months, which is what the government sought. It is significantly higher than the co-defendants who all in this case were receiving at that point in the 300 to 300 and something range. I think it was 300, 327, 360. Many of those were for one murders. But again, two murders still caps you out. Worst case scenario in prior examples in this district at 480 months, which is the appellate waiver, Your Honor, as well, which is why it was set there. And guess what? The judge then went another 40 months higher. I'm way over my time, Your Honor. Thank you. Unless there are further questions. Thank you. You've reserved your time, three minutes for rebuttal. Thank you very much. May it please the Court. My name is Justina Gerasi. I'm an assistant United States attorney in the Eastern District of New York, and I represented the government in the district court, and I continue to do so here on appeal. Among a host of crimes, Hernandez committed two brutal premeditated murders of unarmed men on behalf of the MS-13, for which the government appropriately sought a sentence above the estimated guidelines range contained in his plea agreement, which it was permitted to do under the terms of that agreement. Nothing in the plea agreement says that the government was not prohibited from deviating from its guidelines estimate, and there was simply no breach of the plea agreement here. I understand that, that there's no breach of the plea agreement, because the terms of the plea agreement are pretty clear. If you read them, the government's not bound by that calculation. What about counsel's claim that there was sort of an understanding that the government was going to adhere to the calculation that it was in the plea agreement? So I'll say two things. Can you respond to that? Yes, Your Honor. Because that's troubling, right? I mean, the government had a plea agreement that you're correct, doesn't bind it, and they had an obligation to read it. They signed it. But something doesn't sit well when the government, if the claim is correct, that the government says, yeah, you know, that's on paper, but, you know, this is kind of our understanding of what will happen. That's troubling, right, if it's true. Can you respond to that? Yes, Your Honor. The government disputes that. The only record with respect to that piece of this puzzle was from Mr. Bacharach's argument to the court at sentencing that that had happened. The government didn't have an opportunity at sentencing to respond to that component. I think I responded more to the fact that the defendant did, in fact, receive a benefit under this plea agreement. Moreover, Your Honor. Were you not involved in the negotiations? You said you didn't have an opportunity to respond at sentencing. I was involved in the negotiations, Your Honor. So why did you not have an opportunity to respond? I think at the time, Judge Brown was interested in moving forward with sentencing, and the idea was, does the defendant want to vacate this plea instead of proceed to sentencing? Right, so you had an opportunity to respond. You chose not to speak to it. Is that right? Not to that issue, Your Honor, yes. Why were the guidelines miscalculated in your plea agreement? Your Honor, unfortunately, that was a mistake. We did not include the two-point enhancement with respect to the binding of Acosta. Factually, that should have been in there. Why wasn't it? I mean, you knew they'd been bound. This was an important case. It was, Your Honor. I don't have a great explanation as to why it wasn't included. Did you not realize it? We realized it, Your Honor, and that fact had come out. Okay, so you realized it. What was the decision for not including it in the plea agreement? Unfortunately, Judge, it was an oversight, just as it was in our get-to-continuance. How is it an oversight if you knew that it was applicable? I mean, your adversary suggests this was done deliberately in order to take him out of the guideline range that would have gone to life. Is that correct? No, Your Honor. Well, then why was it? Your Honor, the fact of Acosta being bound was well known, and it's on the record of the plea, in fact. I put it on the record at the plea hearing. The enhancement with respect to being bound, because it was in a different section of the guideline, we frankly overlooked it not only in Hernandez's plea but also in our get-to-continuance, and we acknowledged that to the court in another defendant's plea. We said it in the sentencing memorandum. It should have been included. There's no question it should have been. It was an oversight. Mr. Beckert says that at those other sentences, the government took the position that it would be acceptable to the government to stay within the predicted range. Is that correct? With respect to our get-to-continuance, the government acknowledged that there was a mistake and that the enhancement should have been included but asked the court to sentence that defendant in the guidelines range that was contained in the plea agreement. I will say that it's – I must not be being clear with my questions. I'm sorry, Your Honor. The question to you is, is it correct that at those other sentences, the government adhered to the recommended plea prediction? Not with respect to the correct calculation of the guidelines, Your Honor. We acknowledged there was a mistake and that the guidelines should have included that two-point enhancement. Okay, but here you told the court, sentence him to 480 months, which was above the predicted guideline. Yes. In those other cases, did you tell the court to sentence within the enhanced guideline range when the binding of the victim was calculated in? In our get-to-continuance, we did not, Your Honor. We asked for a sentence in the guidelines range that was contained in the plea agreement. In the predicted guideline range. Correct, Your Honor. So tell me why there's a difference between those – the position you took in those sentences and the position you took here. With respect to our get-to-continuance specifically, Your Honor, as I said, we acknowledged the mistake. The guidelines range was correctly calculated by the court. And we had asked for a sentence in the guidelines range in the plea agreement because he is not similarly situated to Hernandez. That case involved one murder and one murder conspiracy and nothing else. The contrast is pretty stark here. Even under the terms of this plea agreement, the government had the ability to and wanted to argue for a sentence above the guidelines range contained in that plea agreement. So am I correct in understanding you're therefore saying that these defendants are not similarly situated? They are not, Your Honor. Okay. They are not, Your Honor. And was the role in the offense in terms of that other defendant where you didn't ask for the higher amount different than the role of the defendant in this case as well in terms of the commission of this actual? Because as I understand it, this defendant had a higher level within the organization and was summoned to the area where this gentleman was then bound and then brought to a different area where he was killed. Your Honor, this defendant, I think that's a fair thing to say because he had committed another act of violence on behalf of the MS-13 in advance of the Acosta murder. That gives you status in the gang. And so that would be correct to say. Whereas, Arguetta Conde, that was his first murder. That was his first act of violence. He committed a subsequent murder conspiracy or attempted murder after that, but he didn't have the same status in the gang. So you are correct, Your Honor. In addition, obviously, judges, what we considered as far as an appropriate sentence for this defendant involved not only the two murders but the brutal assault that was committed and was part of the discharge term of imprisonment in addition to a murder conspiracy, in addition to the narcotics sales, and the fact that all these crimes were committed in such a quick clip was incredibly disturbing and showed an extreme level of violence that warranted, in our view, a higher sentence, much higher than Arguetta Conde. And I would just note, Your Honor, this is- Was the sentence imposed the highest sentence that could conceivably have been imposed? No, Your Honor. The defendant faced a term of imprisonment up to life under the statute, and the guidelines, as correctly calculated by the court, were life. So certainly these sentences are not life, and it was less than that. So no. And I would just note- So if there were a remand for resentencing, ab initio, just on a clean slate, what is it that Mr. Bachrach could hope to achieve, in your view? Your Honor, I'm not quite sure because the judge made very clear that even if there were an error in the guidelines calculation, his sentence would remain, and it's a very considered sentence. It takes into account the defendant's history and characteristics, including the fact that he immigrated here from El Salvador to avoid the MS-13 and ended up joining the MS-13 very vociferously. And it takes into account his brother's murder, his intellectual disabilities. The judge made very clear this was his measured sentence, irrespective, essentially, of the guidelines range. So I'm not really sure what the result would be. It looks like it would be this. So in response to Judge Cabranes' questions about that, that response goes to the claim of the substantive unreasonableness of his sentence. Yes, exactly, Your Honor. Because he actually didn't receive – he received a below-guideline sentence, or within-guideline sentence, just not life. He didn't receive the maximum. You have it, Your Honor. Certainly below the correctly calculated guidelines. We also argue below the appellate waiver because the sentence, the way it's calculated, includes a 51-month, essentially, adjustment for a fully discharged term of imprisonment that the Bureau of Prisons would not otherwise credit him for. I realize the court wrote it in a certain – Well, he didn't reduce it by 51 months. He kept the sentence at that level and then had credit running back to when he was incarcerated, in effect giving him 51-month credit. Exactly. Exactly, Your Honor. Which you argue that means he waived his sentence, his right to appeal his sentence. I'm not sure that's exactly how that works, Counselor. His sentence was above the appellate waiver. But do you think in retrospect that it's probably wiser in a case like this for the government to be very clear at the change of plea that it is not bound by the calculation that is set forth in the plea agreement? Otherwise, you're leaving yourself open to the claim that there – notwithstanding the language of the plea agreement, there was a wink and a nod. Certainly, Judge. I think perhaps in addition to the language we have in there where it makes clear that the defendant is bound by the stipulation and not the government, there could be some additional language that existed in like Havas and McPherson, which makes clear that the government does intend to seek a sentence that is above this guidelines range. That seems to me, if you're dealing with a defendant that's worse, put them on notice at the plea agreement, that you're not – just a reminder, we're not bound by this. Certainly, Judge. And you don't stand in the same shoes as the other co-defendants. That's certainly accurate, Your Honor. At the time as well, not all of these defendants had been sentenced. The sentences sort of rolled in in the months that just preceded the plea and then continued after the plea in advance of this defendant's sentencing. So as the time goes on, you have more of a fulsome picture. But I take the court's point. May I ask – Judge Cabran has referred to a moment ago as a sidebar question. Judge Brown tried to give the defendant credit for a 51-month sentence imposed earlier by running the sentence he imposed from the date of the arrest on the earlier crime. I'm not sure about what a judge can do in that regard, but I know that as soon as one enters the Bureau of Prisons, the first thing they calculate is your release date. How has the Bureau of Prisons calculated this defendant's release date? Is it giving him – is it taking it back to the date of arrest for that prior crime? Your Honor, I apologize. I haven't checked on that. Well, you're the one who argued that it's really only a 480-month sentence, which would only be a plausible argument if the Bureau of Prisons was calculating it from then. And that's fair, Your Honor. I was suggesting that that was – Judge Brown's – Okay, but you don't know. I don't know as I sit here. No, Your Honor. Would the government be prepared that if that issue came up to clarify that it understood that that's what the court intended, that he get credit for that 51 months? Of course, Your Honor. We suggested it be a downward departure. As I understand, that's typically how BOP sees these. Judge Brown took a different position and said it's sort of six of one, half a dozen the other. We'll run the sentence from his initial arrest date in the federal system and effectively give him credit, as Your Honor noted before. And one final question. There is no dispute that the victim in this case was bound. In fact, the defendant allocated to that at the time of the plea, correct? Correct. And stipulated to that. That is correct, Your Honor. Thank you. Mr. Bachrach. Do you know whether your client's being credited from the date of the earlier arrest? It's usually the most important thing for a defendant to know when he enters prison is what his release date is going to be. Yeah, and I feel very silly right now, Your Honor. I did not check that before coming here. The parties would be willing – I'm sure the government would join me in a Rule 28J letter. That would be helpful. I asked out of curiosity, which maybe others didn't share. Okay. I apologize, Your Honor. It didn't occur to me to look that up. I probably should have. It's a long period of time regardless, and I think that's where the client is. It's arguable that you got a very good deal. I don't think so. No? No. I don't. Well, I think he got a very good deal in that he has the possibility of being sentenced to, under the terms of the plea agreement, he has guidelines that's less than life. I think that's a fair deal for this. It's two murders, and yes, a sentence less than life is a good deal from that perspective, but I also have to take into consideration how other defendants have received sentences in this district, particularly in MS-13 cases. And, you know, the government and I were joking earlier about a case that I know the government rules, the United States v. Luis Ruiz, a former client of mine who received 23 years. He pled guilty to two murders, just like here. They were vicious. They were involving innocent victims, not rival gang members. And, in fact, there was a third murder, too, that had been alleged. So 23 years was a much better deal. So in comparison to that, no. But, yes, of course, you know, any sentence that's less than life is, in that respect, a good deal. But that's why it was so important to the client, to the defendant, that the government stand by the stipulated guideline range in the plea agreement. That was his chance to get a sentence less than life. That's why he agreed to plead guilty for that chance. But does it matter when the court said, I'm going to sentence regardless? It is the court's sentence, not what the government ultimately advocated for, and the plea agreement allows them to. I understand that you're concerned that you and your client had some different understanding and that in other cases they still adhered to the lower calculation. But at the end of the day, it's the judge that sentences. So you can go back in front of the judge, and the judge may say, you know, even though the government agreed to this, this is not the kind of case that deserves this sentence, and it appears this judge did precisely that, made up, you know, came up with a sentence based on the court's own evaluation of your client and the conduct that he was convicted of in his history, et cetera. Two points, Your Honor, very quickly. First, the difference is the starting point, and that is significant, and this court, neither party briefed this in our briefs, but the starting point, this court has ruled previously. I think it was Fernandez. But the court is not bound by the starting point that the government has. No, but the court is not bound by it, but it is reversible error if the starting point is inaccurately calculated, which I guess here is a little gray area because it's about the understandings. Second point, Your Honor, and this also goes to Judge Cabranes' question from earlier, what would happen on remand? If this case were remanded under, was it, under Vival, this case would be remanded to a different judge to cure the judge so that there was no appearance of impropriety, appearance that the potential taint from what occurred in the first proceedings wouldn't carry over before a different judge, based upon how other sentences have occurred in this district, it is reasonable to expect that a different judge would sentence more in line with how every other judge besides Judge Brown has done prior to this sentencing. And so, you know, I think that would be a significant difference if there was a remand. I see my time is up. Thank you. Thank you, Your Honor. Thank you to both sides. We'll take the case under advisement.